CARL E. ROSTAD
Assistant U.S. Attorney
U.S. Attorney's Office
P.O. Box 3447
Great Falls, Montana 59403-3447
Direct Line:   (406) 771-2001
Phone:        (406) 761-7715
FAX:          (406) 453-9973
Email:        Carl.Rostad@usdoj.gov

ATTORNEY FOR PLAINTIFF
UNITED STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>NEAL PAUL ROSETTE,<br><br>Defendant. | CR 15-40-GF-BMM<br>CR 15-61-GF-BMM<br><br><br>CONSOLIDATED OFFER OF PROOF FOR DEFENDANT ROSETTE |
|---|---|

Neal Paul Rosette has moved to withdraw his not guilty pleas and enter guilty pleas to charges in each of the above enumerated cases. As the plea agreements are interdependent and the facts of each separate case often involve overlapping evidence, or relevant evidence under Rule 404(b), *Federal Rules of Evidence*, from one case to the other, the United States, by and through its counsel,

1

Carl E. Rostad, Assistant U.S. Attorney for the District of Montana, submits this Offer of Proof in both cases to provide the factual basis for the defendant's pleas.

*ELEMENTS:*

1. *Indictment in CR 15-40-GF-BMM – Count I*

**Conspiracy**
**Title 18 U.S.C. § 371**

**First**, beginning on or about September 15 and continuing to on or about October 5, 2010, there was an agreement between two or more persons to commit at least one crime as charged in the indictment;

**Second**, that Neal Rosette became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and,

**Third**, one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy, with all of the jury agreeing on a particular overt act that was committed.

2. *Indictment in CR 15-61-GF-BMM – Count III*

**Accepting Bribes by a Tribal Official/Federal Program**
**Title 18 U.S.C. § 666(a)(1)(B)**

**First**, that Neal Paul Rosette was an agent of an Indian tribal government receiving more than $10,000 under any federal program, subsidy,

2

grant, contract or other form of federal assistance;

**Second**, that Neal Paul Rosette accepted and agreed to accept something of value;

**Third**, that Neal Paul Rosette intended to be influenced or rewarded in connection with some business, transaction or series of transactions with the Indian tribal government;

**Fourth**, that the transaction or series of transactions with the Indian tribal government involved a value of $5,000 or more; and

**Fifth**, that Neal Paul Rosette acted corruptly.

3. *Indictment in CR 15-61-GF-BMM—Count V*

**Income Tax Evasion**
**Title 26 U.S.C. § 7201**

**First,** that Neal Paul Rosette owed more federal income tax for the calendar year 2010 than was declared due on the defendant's income tax return for that calendar year;

**Second,** the defendant knew that more federal income tax was owed than was declared due on the defendant's income tax return;

**Third,** the defendant made an affirmative attempt to evade or defeat such additional tax; and

**Fourth,** in attempting to evade or defeat such additional tax, the defendant acted willfully.

*FACTUAL BASIS:*

If this case went to trial, the United States would prove the following:[1]

### I. INTRODUCTION

The Chippewa Cree Tribe of the Rocky Boy's Indian Reservation is located in north central Montana and has a population of approximately 2,500 tribal members. The Tribe is governed by an elected tribal council—the Chippewa Cree Business Committee—and the council and most government functions are headquartered at Box Elder, Montana.

### II. FEDERAL AND OTHER FUNDING SOURCES

Between October 2007 and September 2012, the Chippewa Cree Tribe received $420,439,495.00 in federal funding.

### III. FIRST AMERICAN CAPITAL RESOURCES

In or about May of 2010, officials of the Chippewa Cree Tribe, including members of the Chippewa Cree Business Committee, created First American Capital Resources, LLC (FACR), as a limited liability company wholly-owned by

---

[1] The offer of proof does not encompass all of the proof that the United States would offer at trial but only the proof that would be necessary to support the elements of the charge to which the defendant is pleading guilty. The United States possesses, or may possess, other evidence which may be redundant to the evidence described below or otherwise unnecessary to the purposes of this stage of the proceeding. The United States possesses, or may possess, other evidence which will more fully inform the Court as to the appropriate sentence. Neither the Court nor the defendant should consider this pleading as inclusive of all evidence known to the government or a self-imposed limitation on the evidence it may use in the future for purposes other than to support the entry of plea.

the Tribe, with its headquarters and principal place of business located in Box Elder, Montana.   FACR was created to be a partner with outside interests to provide a pay-day, on-line lending platform which, using tribal sovereignty, could be exempt from state laws and regulations regarding usury and predatory lending practices.   The FACR CEO was Neal Rosette, the FACR COO was Billi Anne Morsette, and the Chairman of the oversight board created by the tribal council to administer the internet lending program was tribal Vice-Chairman, John Chance Houle.

### IV. THE RODEO ACCOUNT EMBEZZLEMENT (CR 15-40-GF-BMM)

On September 15, 2010, Houle authorized and signed a $27,949.33 check from the Chippewa Cree Tribe Tribal Grants and Contracts account held at Wells Fargo Bank payable to the FACR bank account held at Wells Fargo Bank.   Once the Grants and Contracts money was in the FACR account, a check for $6,000 was made payable to Rosette (signed by Morsette) and another check for $6,000 was made payable to Morsette (signed by Rosette).   Also on that same date, a check for $15,000 was written to the Chippewa Cree Tribe Rodeo Association and signed by Rosette and Morsette.   Chance Houle was the President of the Chippewa Cree Rodeo Association with exclusive control over its bank account.[2]

---

[2] Houle plead guilty to using the rodeo account to embezzle significant tribal funds

5

The second payment from the Grants and Contracts account to FACR was made on October 5, 2010, for $27,842.94.   On that same date, a FACR check for $4,000 was made payable to Rosette (signed by Morsette) and another check for $4,000 was made payable to Morsette (signed by Rosette).   Also on that same date, a check for $15,000 was written to the Indian National Finals Rodeo (INFR), and signed by Rosette and Morsette.   Houle used the money to register the rodeo association with INFR and used the embezzled funds to make a direct payment to the organization.

V.   **FACR and Encore**

On October 22, 2010, FACR, the Tribe, and Encore Services Corporation, LLC, of Henderson, Nevada, entered into a Management Agreement making Encore the tribe's partner in the on-line lending business.   Chairman Jake Parker signed for the Tribe, Chance Houle for FACR.   Over the next six months, Encore was unable to fully capitalize the venture and provide the funds necessary to make loans on the scale envisioned by the parties.

**THE FIRST AGREEMENT** (Management Agreement): On October 22, 2010, a management agreement between FACR and Encore was formalized. Within the agreement, FACR is listed as the "Enterprise" and Encore is the

---

during a three year period beginning in 2010. *United States v. Houle, Colliflower, and Leischner*, CR 14-50-GF-BMM.   He was also indicted for the same crime, using a different nominee vendor, in *United States v. Houle and Colliflower*, CR 14-49-GF-BMM.

"Manager." Section 2.9 of the agreement defines the "Enterprise" and states, *"The Enterprise shall not include any commercial enterprise conducted by the Tribe or any other instrumentality of the Tribe other than as set forth immediately above in this Section 2. 8 and any other lawful commercial activity approved by the Board of Directors."* The agreement, therefore, appeared to limit Encore's ability to share in the revenues to only that lending business in which it was actively participating (i.e., making loans).

FACR and Encore do not make any online loans prior to April 2011. The salaries of Rosette and Morsette were subsidized by Encore and its affiliates, along with James Eastlick, Jr., Clinical Psychologist at the Tribe, through bridge loans. One specific loan from Eastlick to cover the salaries of Rosette and Morsette was in December 2010 for $60,000, and the note on the loan was between Eastlick and Encore.

### VI.  Plain Green

In March of 2011, after Rosette had entered into negotiations with Think Finance of Fort Worth, Texas, the Tribe created another online lending company, Plain Green. Plain Green was created for online installment loan lending and, as with FACR, Plain Green would utilize the Tribe's sovereignty to shield the business from state usury and predatory lending laws. Rosette, Morsette, and Houle all remained in the same positions for Plain Green as they had for FACR.

After Rosette's departure in January 2012, Morsette took over both the CEO and the COO roles for FACR and Plain Green.

### VII.  Plain Green and Encore

After a deal was struck between the Tribe, Plain Green, and Think Finance, Encore was no longer a relevant participant.  On March 11, 2011, the day the Tribe created Plain Green, an entity associated with Encore wired $10,000 to the FACR account.  That same day, two checks were written from the FACR account to Rosette and Morsette for $5,000 each with "Loan-Development Fee for PG" written in the memo lines.

Plain Green and its partner, Think Finance, began making loans the first week of April 2011.

On April 12, 2011, Encore emailed Morsette and Rosette seeking to set up a conference call to discuss a "$15K invoice and 10% invoice (Plain Green) – process and requirements.  Fee agreement for approval by FACR/Tribe."

**THE SECOND AGREEMENT** (Revised Management Agreement): On May 4, 2011, and at the request of Encore, a revised management agreement between FACR and Encore was signed.  Under this agreement, Section 2.9 now stated the "Enterprise" shall include FACR "and any other entity formed by the Tribe to undertake business of the type conducted by FACR."  This is after Plain Green and Think Finance have already started making loans in April.  The

amended agreement was designed to provide "exclusive" rights to Encore with regard to all of the Tribe's online lending ventures, including Plain Green. Rosette forged Houle's signature on the revised management agreement.

On July 11, 2015, without any written agreement as to fees, Rosette and/or Morsette wired $38,242 of the Tribe's share of the Plain Green distribution, to Encore.   In late July 2011, Chance Houle signed a Fee Agreement on behalf of the Tribe as Chairman (even though he was not the Chairman at the time), providing Encore Services, LLC, a newly formed company owned by the same individuals of Encore Service Corporation,[3] 15% of all profits from the Plain Green – Think Finance venture.   This agreement was backdated to June 1, 2011, one day before Plain Green received its first payment of $199,141.   There were no board meeting minutes, tribal council meeting minutes, or tribal resolutions approving this agreement but it served to give Encore a share of the Tribe's first payment.

Houle received $145,874 in Plain Green profits—facilitated by Rosette and Morsette—in exchange for his signature and approval of the new Fee Agreement which diverted 15% of Plain Green revenues to Encore.

---

[3] For the purposes of this Offer, both entities will be called Encore.   While they may have had a separate legal existence, there does not appear to be any practical distinction between the ownership or control of the entities.

9

## VIII. Encore and Ideal Consulting

On August 3, 2011, an entity called Ideal Consulting, LLC, invoiced Encore for "5% consulting fees" for the months of May, June and July 2011. The total billed was $50,652.40. That same day, Plain Green wired $93,800.42 to Encore Services. Ideal Consulting had registered with the Montana Secretary of State's Office on August 2, 2011. Eastlick opened a bank account using the articles of incorporation for Ideal Consulting at Wells Fargo Bank in Havre, and on August 5, 2011, an Encore affiliate wired $50,652.40 to the new account.

At its essence, the scheme that began with the second agreement was designed to put Encore back into the tribal stream of revenue from the on-line lending operation once Think had come into supplant Encore. In exchange for giving Encore 10% of the tribe's revenues, Encore agreed to take 15% and kick 5% back to Rosette, Morsette, and Eastlick as a reward for keeping money flowing to Encore, even though it had not been able to establish a viable lending operation.

The relationship with Encore, and the resulting payments to Ideal, continued for the next two years; until July 31, 2013. In that time, Plain Green paid Encore $3,523,471, and Encore paid Ideal $1,208,395. The profits from the scheme were split evenly between Rosette, Morsette and Eastlick—each taking over $400,000.

In later civil proceedings, Rosette admitted the Chippewa Cree Business Committee, and other members of the Tribe, were not aware of Ideal Consulting

10

and the payments made to him through that company from Encore. Rosette also admitted the Joint Venture Agreement between Ideal, the Tribe and Encore was signed in the fall of 2012 (even though it is dated June 17, 2011) and the document was designed to legitimize the payments made to Ideal once tribal officials became aware that Encore was sharing 33% of its payments from Plain Green with Rosette and Morsette and Eastlick.

## IX. Tax Evasion

Rosette received the bulk of his annual income for the tax years 2010, 2011, 2012, and 2013 through salary, payments from Ideal Consulting, and, in 2010, his share of the embezzlement from the Grants and Contracts account. He filed a return for tax year 2010, and filed no timely returns for 2011, 2012, or 2013. Because the parties have stipulated to restitution for all four years identified in the Indictment—even though the count of conviction relates only to a false return for 2010 filed in 2011—this offer of proof will address income in all four years.

For the 2010 tax year, Rosette omitted large and well documented amounts of income from his return. As a way to conceal certain payments to him, Rosette used a family member as a nominee to receive certain payments. Rosette filed his 2010 Original Return timely, signing the return on March 4, 2011, and transmitting it to the IRS on July 15, 2011. After first being contacted by law enforcement on May 14, 2014, and being asked questions related to his financial situation, Rosette

contacted a different return preparer and retained her services to amend his 2010 tax return. Rosette signed his 2010 Amended Return on September 8, 2014, and the IRS received it on September 12, 2014.

Rosette's 2010 Amended Return reported additional Schedule C business income of $23,287 which was related to income from Arrowhead Processing and ExtraFunds.com, LLC, and $15,159 of Schedule E rental income related to money received from the CCT for renting his truck during the flood disaster of 2010. But even after amending his 2010 tax return, Rosette still failed to include certain items of income from his return. All told, Rosette underreported his 2010 taxable income on his original return by $82,117.97, which resulted in a tax deficiency of $25,156.

From the Grants and Contracts embezzlement in September and November 2010 (*United States v. Rosette et al*, CR 15-40-GF-BMM), Rosette received the following payments, none of which were reported to the Internal Revenue Service as no return was ever filed for 2011.

| Date | Check No. | Payee | Amount | Memo |
|---|---|---|---|---|
| 09/15/2010 | 109 | Neal Rosette, Sr. | $6,000.00 | None |
| 10/05/2010 | 113 | Neal Rosette, Sr. | $4,000.00 | Incentive |
| 11/04/2010 | 1005 | Neal Rosette | $6,500.00 | Incentive |
| 11/29/2010 | 1010 | Neal Rosette | $3,500.00 | Incentive-Final Payment |

As noted above, in August 2011, Rosette and Eastlick set up a company called Ideal Consulting, LLC.   Ideal Consulting was set up for the purpose of receiving payments from Encore.

During the period June 1, 2011, through July, 10, 2013, $1.2 M was received by Ideal Consulting, which would be split amongst the three partners of Ideal Consulting; Morsette, Rosette, and Eastlick.   Rosette personally received $401,450 from Ideal Consulting, none of which was ever timely reported to the Internal Revenue Service as income.

On May 13, 2010, when the Tribe created a tribal enterprise named First American Capital Resources LLC ("FACR"), Rosette was hired as the CEO. While at FACR, Rosette was earning about $130,000/year.

In January 2012, Rosette's employment from FACR and Plain Green severed.   He was offered a Severance Agreement ("Severance") to terminate his employment.   The FACR and Plain Green board members and tribal leadership were concerned about Rosette's bad and erratic behavior, addictions (drugs and alcohol), financial troubles and apprehensive about how these issues might affect relationships with outside/third-party online lending partners.   Rosette initially wanted over a million dollars to sever his employment but eventually agreed on a settlement of approximately $218,680.13.   Part of this agreement included paying

13

off debt Rosette owed to various parties including prior and current tax liabilities owed to the IRS.

Specifically, Rosette received $90,093.10 as part of his Severance package which was intended to pay-off federal tax liabilities Rosette already owed for prior years or would owe to the IRS as a result of the Severance. The payments were as follows:

| Date | Amount | Payee | Purpose |
|---|---|---|---|
| 04/11/2012 | $38,058.26 | US Dept of Treasury | Per the Severance, this was to pay off prior tax liabilities related to years 2007; 2009; and 2010 |
| 11/13/2012 | $23,361.00 | Neal Rosette | Per the Severance, this was supposed to be used to pay off taxes related to the severance income received in 2012 |
| 04/18/2013 | $28,673.84 | Neal Rosette | Per the Severance, this was supposed to be used to pay off taxes related to the severance income received in 2012 |

Of the $90,093.10, only the first check of $38,058.26 made its way to the IRS. Rosette used his relationship and influence over Morsette, who was the individual writing the Severance checks and other board members, to have the 2nd and 3rd checks made payable to himself rather than the IRS. In effect, Rosette was able to direct $52,034.84 to himself rather than the IRS as was his original stated intent.

If called upon to prove the case at trial the United States would identify the following amounts in the corresponding years as the amount of tax due and owing based upon the unreported amounts described in the Indictment:

| Tax Year(s) or Period(s) and Items | Amount to be Credited to Tax |
|---|---|
| 2010 | $ 25,156.00 |
| 2011 | $ 38,175.00 |
| 2012 | $121,095.00 |
| 2013 | $ 48,254.00 |
| **Total** | **$232,680.00** |

DATED this 25th day of November, 2015.

                MICHAEL W. COTTER
                United States Attorney


                s/ Carl E. Rostad
                CARL E. ROSTAD
                Assistant U.S. Attorney
                Attorney for Plaintiff