CARL E. ROSTAD
Assistant U.S. Attorney
U.S. Attorney's Office
P.O. Box 3447
Great Falls, Montana 59403-3447
Direct Line:   (406) 771-2001
Phone:	(406) 761-7715
FAX:	(406) 453-9973
Email:	Carl.Rostad@usdoj.gov

ATTORNEY FOR PLAINTIFF
UNITED STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>BILLI ANNE RAINING BIRD MORSETTE,<br><br>Defendant. | CR 15-40-GF-BMM<br>CR 15-61-GF-BMM<br><br><br>CONSOLIDATED OFFER OF PROOF FOR DEFENDANT MORSETTE |
|---|---|

Billi Anne Raining Bird Morsette has moved to withdraw her not guilty pleas and enter guilty pleas to charges in each of the above enumerated cases. As the plea agreements are interdependent and the facts of each separate case often involve overlapping evidence, or relevant evidence under Rule 404(b), *Federal*

1

*Rules of Evidence*, from one case to the other, the United States, by and through its counsel, Carl E. Rostad, Assistant U.S. Attorney for the District of Montana, submits this Offer of Proof in both cases to provide the factual basis for the defendant's pleas.

*ELEMENTS:*

1. ***Indictment in CR 15-40-GF-BMM – Count I***

**Conspiracy**
**Title 18 U.S.C. § 371**

**First**, beginning on or about September 15 and continuing to on or about October 5, 2010, there was an agreement between two or more persons to commit at least one crime as charged in the indictment;

**Second**, that Billi Anne Morsette became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and,

**Third**, one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy, with all of the jury agreeing on a particular overt act that was committed.

## 2. Indictment in CR 15-61-GF-BMM – Count III

### Accepting Bribes by a Tribal Official/Federal Program
### Title 18 U.S.C. § 666(a)(1)(B)

**First**, that Billi Anne Morsette was an agent of an Indian tribal government receiving more than $10,000 under any federal program, subsidy, grant, contract or other form of federal assistance;

**Second**, that Billi Anne Morsette accepted and agreed to accept something of value;

**Third**, that Billi Anne Morsette intended to be influenced or rewarded in connection with some business, transaction or series of transactions with the Indian tribal government;

**Fourth**, that the transaction or series of transactions with the Indian tribal government involved a value of $5,000 or more; and

**Fifth**, that Billi Anne Morsette acted corruptly.

## 3. Indictment in CR 15-61-GF-BMM—Count XI

### Willful Failure to File Income Tax Return
### Title 26 U.S.C. § 7203

**First**, the defendant owed taxes and was required to file a return for the calendar year ending December 31, 2012;

**Second**, the defendant failed to file an income tax return by October 15, 2013, as required by Title 26 of the United States Code; and

**Third**, in failing to do so, the defendant acted willfully.

*FACTUAL BASIS:*

If this case went to trial, the United States would prove the following:[1]

## I. INTRODUCTION

The Chippewa Cree Tribe of the Rocky Boy's Indian Reservation is located in north central Montana and has a population of approximately 2,500 tribal members. The Tribe is governed by an elected tribal council—the Chippewa Cree Business Committee—and the council and most government functions are headquartered at Box Elder, Montana.

## II. FEDERAL AND OTHER FUNDING SOURCES

Between October 2007 and September 2012, the Chippewa Cree Tribe received $420,439,495.00 in federal funding.

## III. FIRST AMERICAN CAPITAL RESOURCES

In or about May of 2010, officials of the Chippewa Cree Tribe, including members of the Chippewa Cree Business Committee, created First American

---

[1] The offer of proof does not encompass all of the proof that the United States would offer at trial but only the proof that would be necessary to support the elements of the charge to which the defendant is pleading guilty. The United States possesses, or may possess, other evidence which may be redundant to the evidence described below or otherwise unnecessary to the purposes of this stage of the proceeding. The United States possesses, or may possess, other evidence which will more fully inform the Court as to the appropriate sentence. Neither the Court nor the defendant should consider this pleading as inclusive of all evidence known to the government or a self-imposed limitation on the evidence it may use in the future for purposes other than to support the entry of plea.

4

Capital Resources, LLC (FACR), as a limited liability company wholly-owned by the Tribe, with its headquarters and principal place of business located in Box Elder, Montana. FACR was created to be a partner with outside interests to provide a pay-day, on-line lending platform which, using tribal sovereignty, which could be exempt from state laws and regulations regarding usury and predatory lending practices. The FACR CEO was Neal Rosette, Sr., the FACR COO was Billi Anne Morsette, and the Chairman of the oversight board created by the tribal council to administer the internet lending program was tribal Vice-Chairman, John Chance Houle.

## IV.  THE RODEO ACCOUNT EMBEZZLEMENT
   (CR 15-40-GF-BMM)

On September 15, 2010, Houle authorized and signed a $27,949.33 check from the Chippewa Cree Tribe Tribal Grants and Contracts account held at Wells Fargo Bank payable to the FACR bank account held at Wells Fargo Bank. Once the Grants and Contracts money was in the FACR account, a check for $6,000 was made payable to Rosette (signed by Morsette) and another check for $6,000 was made payable to Morsette (signed by Rosette). Also on that same date, a check for $15,000 was written to the Chippewa Cree Tribe Rodeo Association and signed

5

by Rosette and Morsette. Chance Houle was the President of the Chippewa Cree Rodeo Association with exclusive control over its bank account.[2]

The second payment from the Grants and Contracts account to FACR was made on October 5, 2010, for $27,842.94. On that same date, a FACR check for $4,000 was made payable to Rosette (signed by Morsette) and another check for $4,000 was made payable to Morsette (signed by Rosette). Also on that same date, a check for $15,000 was written to the Indian National Finals Rodeo (INFR) and signed by Rosette and Morsette. Houle used the money to register the rodeo association with INFR and used the embezzled funds to make a direct payment to the organization.

## V. FACR and Encore

On October 22, 2010, FACR, the Tribe, and Encore Services Corporation, LLC, of Henderson, Nevada, entered into a Management Agreement making Encore the tribe's partner in the on-line lending business. Chairman Jake Parker signed for the Tribe, Chance Houle for FACR. Over the next six months, Encore was unable to fully capitalize the venture and provide the funds necessary to make loans on the scale envisioned by the parties.

---

[2] Houle plead guilty to using the rodeo account to embezzle significant tribal funds during a three year period beginning in 2010. *United States v. Houle, Colliflower, and Leischner*, CR 14-50-GF-BMM. He was also indicted for the same crime, using a different nominee vendor, in *United States v. Houle and Colliflower*, CR 14-49-GF-BMM.

**THE FIRST AGREEMENT** (Management Agreement): On October 22, 2010, a management agreement between FACR and Encore was formalized. Within the agreement, FACR is listed as the "Enterprise" and Encore is the "Manager." Section 2.9 of the agreement defines the "Enterprise" and states, *"The Enterprise shall not include any commercial enterprise conducted by the Tribe or any other instrumentality of the Tribe other than as set forth immediately above in this Section 2. 8 and any other lawful commercial activity approved by the Board of Directors."* The agreement, therefore, appeared to limit Encore's ability to share in the revenues to only that lending business in which it was actively participating (i.e., making loans).

FACR and Encore did not make any online loans prior to April 2011. The salaries of Rosette and Morsette were subsidized by Encore and its affiliates, along with James Eastlick, Jr., Clinical Psychologist at the Tribe, through bridge loans. One specific loan from Eastlick to cover the salaries of Rosette and Morsette was in December 2010 for $60,000, and the note on the loan was between Eastlick and Encore.

**VI.   Plain Green**

In March of 2011, after Rosette had entered into negotiations with Think Finance of Fort Worth, Texas, the Tribe created another online lending company, Plain Green. Plain Green was for online installment loan lending and, as with

7

FACR, Plain Green would utilize the Tribe's sovereignty to shield the business from state usury and predatory lending laws. Rosette, Morsette, and Houle all remained in the same positions for Plain Green as they had for FACR. After Rosette's departure in January 2012, Morsette took over both the CEO and the COO roles for FACR and Plain Green.

### VII. Plain Green and Encore

After a deal was struck between the Tribe, Plain Green, and Think Finance, Encore was no longer a relevant participant. On March 11, 2011, the day the Tribe created Plain Green, an entity associated with Encore wired $10,000 to the FACR account. That same day, two checks were written from the FACR account to Rosette and Morsette for $5,000 each with "Loan-Development Fee for PG" written in the memo lines.

Plain Green and its partner, Think Finance, began making loans the first week of April 2011.

On April 12, 2011, Encore emailed Morsette and Rosette seeking to set up a conference call to discuss a "$15K invoice and 10% invoice (Plain Green) – process and requirements. Fee agreement for approval by FACR/Tribe."

**THE SECOND AGREEMENT** (Revised Management Agreement): On May 4, 2011, and at the request of Encore, a revised management agreement between FACR and Encore was signed. Under this agreement, Section 2.9 now

8

stated the "Enterprise" shall include FACR "and any other entity formed by the Tribe to undertake business of the type conducted by FACR." This is after Plain Green and Think Finance have already started making loans in April. The amended agreement was designed to provide "exclusive" rights to Encore with regard to all of the Tribe's online lending ventures, including Plain Green. Rosette forged Houle's signature on the revised management agreement.

On July 11, 2015, without any written agreement as to fees, Rosette and/or Morsette wired $38,242 of the Tribe's share of the Plain Green distribution, to Encore. In late July 2011, Chance Houle signed a Fee Agreement on behalf of the Tribe as Chairman (even though he was not the Chairman at the time), providing Encore Services, LLC, a newly formed company owned by the same individuals of Encore Service Corporation,[3] 15% of all profits from the Plain Green – Think Finance venture. This agreement was backdated to June 1, 2011, one day before Plain Green received its first payment of $199,141. There were no board meeting minutes, tribal council meeting minutes or tribal resolutions approving of this agreement, but it served to give Encore a share of the Tribe's first payment.

---

[3] For the purposes of this Offer, both entities will be called Encore. While they may have had a separate legal existence, there does not appear to be any practical distinction between the ownership or control of the entities.

Houle received $145,874 in Plain Green profits—facilitated by Rosette and Morsette—in exchange for his signature and approval of the new Fee Agreement which diverted 15% of Plain Green revenues to Encore.

## VIII.     Encore and Ideal Consulting

On August 3, 2011, an entity called Ideal Consulting, LLC invoiced Encore for "5% consulting fees" for the months of May, June and July 2011. The total billed was $50,652.40. That same day, Plain Green wired $93,800.42 to Encore Services. Ideal Consulting had registered with the Montana Secretary of State's Office on August 2, 2011. Eastlick opened a bank account using the articles of incorporation for Ideal Consulting at Wells Fargo Bank in Havre, and on August 5, 2011, an Encore affiliate wired $50,652.40 to the new account.

At its essence, the scheme that began with the second agreement was designed to put Encore back into the tribal stream of revenue from the on-line lending operation once Think had come in to supplant Encore. In exchange for giving Encore 10% of the tribe's revenues, Encore agreed to take 15% and kick 5% back to Rosette, Morsette, and Eastlick as a reward for keeping money flowing to Encore even though it had not been able to establish a viable lending operation.

The relationship with Encore, and the resulting payments to Ideal, continued for the next two years; until July 31, 2013. In that time, Plain Green paid Encore

$3,523,471, and Encore paid Ideal $1,208,395. The profits from the scheme were split evenly between Rosette, Morsette and Eastlick—each taking over $400,000.

In later civil proceedings, Rosette admitted the Chippewa Cree Business Committee, and other members of the Tribe, were not aware of Ideal Consulting and the payments made to him through that company from Encore. Rosette also admitted the Joint Venture Agreement between Ideal, the Tribe and Encore was signed in the fall of 2012 (even though it is dated June 17, 2011), and the document was designed to legitimize the payments made to Ideal once tribal officials became aware that Encore was sharing 33% of its payments from Plain Green with Rosette and Morsette and Eastlick.

### IX. Failure to File returns

Morsette received the bulk of her annual income for the tax years 2010, 2011, 2012, and 2013 through salary, payments from Ideal Consulting, and, in 2010, her share of the embezzlement from the Grants and Contracts account. Although she received over $914,000 in gross income in the four years of 2010, 2011, 2012, and 2013, she filed no tax returns. She did, on occasion, file extensions that would give her until October to file a return, but then never filed a return. Because the parties have stipulated to restitution for all four years identified in the Indictment—even though the count of conviction relates only to a failure to file for 2012—this offer of proof will address income in all four years.

Based upon the investigation of the Internal Revenue Service, and giving her a Head of Household filing status (which was consistent with the last year Morsette did file a federal income tax return [2009]), the tax due and owing for 2010 was $8,120; for 2011, $23,281; for 2012, $84,038; and for 2013, $49,814. Total tax due and owing for Morsette, as provided for in the plea agreement in CR 15-61-GF-BMM is $165,253.

DATED this 25th day of November, 2015.

MICHAEL W. COTTER
United States Attorney

s/ Carl E. Rostad
CARL E. ROSTAD
Assistant U.S. Attorney
Attorney for Plaintiff